IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 18, 2010

IN RE ELIJAH B., ET AL.

Appeal from the Juvenile Court for Greene County
No. J21376     Kenneth N. Bailey, Jr., Judge

No. E2010-00387-COA-R3-PT - FILED DECEMBER 29, 2010

Eric B. ("Father") appeals the termination of his parental rights with respect to his two minor children. The Department of Children's Services ("DCS") petitioned to terminate Father's rights based upon allegations of abandonment, substantial noncompliance with a permanency plan, and persistence of conditions. Following a hearing, which Father failed to attend, the trial court granted the petition upon finding, by clear and convincing evidence, that all of the alleged grounds were established and that termination was in the best interest of the children. On appeal, Father asserts that his due process rights were violated. He also challenges the weight of the evidence supporting the court's decision to terminate his parental rights. We reject both challenges. Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Sandy Phillips, Johnson City, Tennessee, for the appellant, Eric B.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Joshua Davis Baker, Assistant Attorney General; Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

Two children were born to Father and his wife, Crystal B. ("Mother")[1] – a son, Elijah, on May 22, 2000, and a daughter, Abigail, on January 7, 2006. In May 2006, DCS filed a petition seeking an adjudication that the children were dependent and neglected. The petition stemmed from an incident in which Father and Mother were arrested when they, with both of the children present, were observed stealing some $738 in electronic goods from a WalMart store and secreting them in a diaper bag. During a search incident to both parents' arrest, officers discovered in Mother's purse two spoons and two syringes containing residue that appeared to be cocaine. Father claimed that these items belonged to him. Father pleaded guilty to charges of theft over $500 and possession of drug paraphernalia and was sentenced to 11 months and 29 days in jail with all but four days suspended. Father was already on probation at the time of the offenses. In the ensuing DCS investigation, Father admitted to being a drug addict in need of help. He admitted he had used crack cocaine and morphine in the children's presence the night before his arrest. Although Father claimed Mother no longer used drugs, the investigator observed needle tracks on both of their arms.

In further support of the petition, the DCS case manager noted that DCS had received a referral the previous month from officials at Elijah's school regarding possible medical neglect – the child was hearing impaired and was supposed to be wearing a hearing aid in one ear but had repeatedly come to school without it. More recently, the child had stopped attending school. The petition further alleged that the children were in need of immediate protection because the family had no stable housing – they had recently resided at the Andrew Johnson motel. The parents said they were in the process of getting a trailer when both were jailed. At that time, Child Protective Services "completed a safety plan and placed the children temporarily with [a grandmother]. However, after a DCS records check, the children were moved to a DCS foster home."

The children were brought into the protective custody of DCS on May 23, 2006. At a status hearing the following month, the court found, by clear and convincing evidence, that the children were dependent and neglected; the parents remained in jail and stipulated to the allegations. The court noted that DCS had created a permanency plan for the children and was using reasonable efforts to meet the stated dual goals of reuniting the family or having the children exit custody to live with a relative. Father was ordered to submit to random drug screens; if he passed them, he would be allowed to have supervised visits with the children. In addition, Father was to undergo an alcohol and drug assessment and his attendance in an in-patient drug treatment program was recommended. To this end, DCS arranged for Father

---

[1]Mother voluntarily surrendered her parental rights prior to the hearing below. She is not a party on this appeal and we mention her only as is necessary to flesh out the underlying facts.

to complete an alcohol and drug assessment. The plan also charged Father with the task of completing a mental health assessment and following all recommendations; maintaining sobriety while the children were in state custody; securing employment and adequate housing; and abiding by all laws and the conditions of his probation. Father acknowledged his participation in the plan's development, reviewed its terms, and agreed to them. In addition, Father signed a statement acknowledging that he had received a copy of the "Criteria & Procedures for Termination of Parental Rights" and that its contents had been explained to him.

One year into the children's foster care placement, DCS family services case manager Kimberly Shirley completed an "Affidavit of Reasonable Efforts" in which she concluded, "[a]t this juncture, it is unlikely the children could ever be reunified with their parents" and noted that DCS was pursuing the termination of their rights. She noted that services were at first provided to both parents, but that they were "noncompliant and did not keep [DCS] notified of their whereabouts." Because of the parents' noncompliance and failure to notify, DCS services were terminated. By January 2008, Ms. Shirley reported that the children remained in a foster home "where all their needs are being met" and that DCS had had no contact with Father.

At an October 2008 hearing, the trial court found that it would be detrimental to the children and not in their best interest to be removed from their current foster home and placed in the custody of their paternal grandmother who had sought custody of them. At the same hearing, Father was ordered to submit to a hair follicle drug test. He was advised that if he passed two drug screens, a "no-contact" order then preventing his visitation with the children would be lifted. DCS records showed that Father submitted to the drug test and passed it on December 11, 2008.

On January 27, 2009, DCS petitioned to terminate Father's parental rights. The petition alleged four grounds for termination: abandonment by failure to visit, abandonment by failure to provide child support, substantial noncompliance with the permanency plan, and the persistence of conditions that caused the children to be removed, with little likelihood of those conditions being remedied in the foreseeable future.

Father had supervised visits with the children on December 31, 2008, and February 6, 28, 2009. During that time, Elijah attended 2nd grade; he had exhibited some behavior problems affecting his grades. He was diagnosed with mild mental retardation for which he was receiving special education services. In addition, he received speech therapy three times a week for his partial deafness.

A bench trial was held on December 8, 2009. At the time of the hearing, the children were nine and three and had been in state custody for nearly three years. At the start of the trial, the court noted Father's absence. Father's counsel, Ms. Luther, advised the court that she had notified Father of the hearing date but had no contact with him in the past two months. In its termination order, the court expressly found that "[Father] was properly served and this matter is properly before this Court." Ms. Luther was permitted to withdraw and the hearing proceeded. Ms. Shirley, the only witness, essentially recited the procedural and factual history of the children's case and answered additional questions from the court. At the conclusion of the trial, the court terminated Father's rights.

Father filed a timely notice of appeal. He asserts that neither the law nor the evidence supports the trial court's decision; he moves us to restore his parental rights.

II.

Father raises the following issues for our review:

> 1. Were Father's due process rights violated by not being provided appropriate notice of the hearing for the termination of parental rights?
>
> 2. Were Father's due process rights violated when he was not provided counsel at the hearing for the termination of parental rights?
>
> 3. Was the judgment contrary to the weight of the evidence?

III.

Our review of this non-jury case is *de novo*. The trial court's findings of fact, however, come to us with a presumption of correctness that we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded the trial court's decisions regarding witness credibility; such determinations will not be reversed absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). No presumption of correctness attaches to the trial court's conclusions of law. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

A parent has a fundamental right to the care, custody, and control of the parent's children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other individuals and the government, they are not absolute, and can be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon a finding by the court (1) "that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Tenn. Code Ann. § 36-1-113(c)(Supp. 2007); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

On our review, we proceed mindful of our duty "to determine whether the trial court's findings, made under this clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d at 530.

IV.

In his first two issues, Father alleges that the termination hearing was held in violation of his due process rights. More specifically, he contends that he was not properly notified of the hearing date and was denied his right to counsel. We address these issues together.

As relevant to both issues, Father was deemed indigent and Ms. Luther was appointed as his counsel in April 2009. *See* Tenn. S. Ct. R. 13, Sec. 1 (2)(b) (providing that counsel shall, upon request, be appointed to an indigent party in an action which may result in termination of the party's parental rights). The order of appointment expressly provides that counsel would represent Father to the conclusion of trial and on any subsequent appeals in this case. On August 18, 2009, the original hearing date, Father was present when the hearing was rescheduled to October 13 on motion of the children's guardian ad litem. On October 13, the parties appeared at court. Before the case was called, counsel met in the hall outside the courtroom and agreed to reschedule the hearing to December 8, 2009.

At the start of the hearing on December 8, the trial court questioned Father's counsel regarding Father's absence:

The Court: Ms. Luther, your client?

Counsel: I don't know where he is, Your Honor. I haven't, in all candor, spoken with him since October. I haven't been able to reach him and I would like to withdraw from the case.

The Court: Okay. I will permit your withdrawal. Hum . . . I'm shocked that he's not here because he's . . .

Counsel: Yeah, he's always been to court hearings before, but I haven't been able to get a hold of him in almost a month and a half.

The Court: Okay. And he was present the previous Court hearing when this was set for today, I believe?

Counsel: I believe we reset without coming actually into the Courtroom, but I did notify him that day.

\* \* \*

The Court: [A]nd the case was set at 8:30. The clock on the wall now says it is 8:58, so . . . [Bailiff], if you'll just call [Father's] name out in the hall to . . . confirm he's not present.

Counsel: Your Honor, I know in the past he's expressed concerns about having to take off from work. I don't know if that was an issue today.

The Court: [Father] has not answered.

In its termination order, the trial court addressed Father's failure to attend the hearing:

The Court also wants to state that this morning Ms. Luther, [Father's] attorney was present, and she stated that he has not contacted her since October, has failed to assist her in preparing for this case. The Court did permit Ms. Luther to withdraw since [Father] did not appear here this morning, and she said she had notified him of today's Hearing, and the Court has reviewed the notes from the . . . August Hearing and the case had been

-6-

> reset till October, and in October it had to be reset until today,
> and Ms. Luther said that [Father] was present in the hall in
> October, and she had advised him the case was reset until today,
> December 8, 2009, and he has failed to show.

"Basic due process requires 'notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002)(citing *State v. Pearson*, 858 S.W.2d 879, 884 (Tenn. 1993) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 94 L. Ed. 865, 70 S. Ct. 652 (1950)). Further, "[d]ue process is a flexible concept that 'calls for such procedural protections as the particular situation demands.' " *Id*. (quoting *Wilson v. Wilson*, 984 S.W.2d 898, 902 (Tenn. 1998)).

Father asserts that the failure to "formally" reschedule the October 13 hearing, on the record and in open court, effectively denied him the chance to defend his fundamental right to the care and custody of the children. We cannot agree. Whether the agreed continuance took place outside or inside the courtroom is, in our view, irrelevant to the question of whether Father in fact was given proper notice of the rescheduled hearing. Ms. Luther informed the court that she personally notified Father of the new hearing date on the day it was rescheduled. Father does not dispute his counsel's assertion that she notified him of the rescheduled hearing; he simply asserts that the notice he was given was not "appropriate notice." Father argues that "[t]here is no evidence that [his] attorney or the court clerk wrote the court date down for [Father] or took any other steps besides a passing reference in the hallway to insure [that Father] would know and remember the court date."

Father has conceded that he appeared for the October 13, 2009, hearing and that his attorney verbally notified him at that time that the hearing had been rescheduled for December 8. We conclude that due process principles requiring notice and the opportunity to be heard were satisfied in this case when Father was personally notified of the new hearing date.

Next, Father asserts that his due process rights were violated when the trial court allowed his counsel to withdraw prior to the hearing without Father's "knowledge or permission." He concludes that the absence of counsel materially and adversely affected his interest because there was no one to present any argument or introduce any evidence on his behalf.

As we discussed earlier in this opinion, there is no question that Father was entitled to and provided with appointed counsel in preparation for the termination hearing. In seeking permission to withdraw at the start of the hearing, Ms. Luther advised the court that

she had no knowledge of Father's whereabouts and had not been able to reach him "in almost a month and a half" since the hearing was continued from its October setting. The issue becomes whether Father effectively waived his right to counsel by failing to communicate with Ms. Luther in the months leading up to the hearing and then leaving her to appear without him. "One who is entitled to be represented by appointed counsel can waive that right. Failure to cooperate with appointed counsel can constitute a waiver of the right to appointed counsel." *In re M.E.*, No. M2003-00859-COA-R3-PT, 2003 WL 1838179, at *12, (Tenn. Ct. App. M.S., filed August 16, 2004).

This Court was confronted with a situation factually similar to the present case in ***Tenn. Dept. of Children's Svcs. v. Agbigor***, No. M2000-03214-COA-R3-JV, 2002 WL 31528509, at *6 (Tenn. Ct. App. Nov. 15, 2002) (*perm. app. denied*). Therein, Mr. Agbigor, the defendant in a termination action, decided to take a month-long trip out of the country and returned only two weeks before his trial date. Upon his return, he failed to contact his attorney in preparation for the hearing. When the hearing began, Mr. Agbigor's attorney, who had represented him in the case for three years, advised the court that Mr. Agbigor had not contacted him in several months and the attorney had been unable to contact Mr. Agbigor. Upon arriving at the hearing an hour later, Mr. Agbigor was questioned by the court regarding his attorney's motion to withdraw; he did not dispute counsel's assertions. As a result, counsel was allowed to withdraw and Mr. Agbigor was advised that he would have to represent himself. Under these facts, this Court concluded that Mr. Agbigor's due process rights were not violated: "His own conduct in refusing to cooperate with the attorney who had represented him since August 25, 1997, is the sole reason he had no attorney at the final termination hearing. By his own conduct, he effectively waived his less than absolute right to appointed counsel." *Id*. at *6.

Returning to the present case, Father did not attend the hearing on December 8, 2009 – obviously, then, he did not directly respond to his attorney's statements to the court that day, *i.e.*, that she had informed Father of the hearing, but had not heard from him, had been unable to contact him, and did not know where to find him in preparation for the hearing. Neither, however, does Father, in his brief, address his failure to contact or communicate with his counsel or offer any real reason for his absence at the December 8 hearing. Again, a "defendant in a termination of parental rights case has no absolute right to be represented by counsel." *Agbigor*, 2002 WL 31528509 at *5 (citing ***Lassiter v. Department of Social Serv.***, 452 U.S. 18, 68 L. Ed. 2d 640, 101 S. Ct. 2153 (1981); ***In re: K.D.D.***, No. M2000-01554-COA-R3-JV, 2001 WL 219669 (Tenn. Ct. App. Mar. 7, 2001)). On our considered review, we conclude that Father, like Mr. Agbigor, did not suffer a due process violation, but rather effectively waived his right to appointed counsel by failing to assist his counsel or communicate with her at all in the two months before the hearing. Furthermore, we find no due process violation in the trial court's decision to proceed with the hearing in

the absence of Father. The record clearly reflects that he knew of the hearing date. He has failed to adequately explain his absence. The trial court did not abuse its discretion in proceeding without him.

V.

In the present case, the trial court terminated Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113 (g)(1),(2), and (3)(2010). These statutory provisions provide as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan. . . ;
>
> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

As relevant to the present case, Tenn. Code Ann. § 36-1-102 (2010) – as referenced in subsection (g)(1) above – provides for the termination of parental rights on the ground of abandonment as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
>       \*     \*     \*
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
>
>       \*     \*     \*
>
> (C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;
>
> (D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;
>
> (E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

-10-

*See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (C),(D), and (E).

## VI.

### A.

Father challenges the trial court's conclusion that each of the relied upon grounds for terminating his rights was established by clear and convincing evidence. We address those grounds in turn.

### B.

The trial court found that Father abandoned the children by willfully failing to visit and willfully failing to support them:

> In particular, as for grounds, the abandonment, failure to visit[,] the Court finds that [in] the four months prior to the filing of this Petition . . . in January of '09, [Father] had visited one time, and that was a token visitation which was not sufficient and, therefore, he abandoned the [C]hildren by failing to visit during the months prior [to] this Petition being filed.
>
> The Court acknowledges that the Circuit Court has recently reinstated some visitation for [Father], and he has begun visiting again. So it is possible the Court of Appeals looks at this and that they may find that that ground has not been met, but be that as it may, the Court is confident the other three grounds will stand.
>
> The abandonment, failure to support, there has been no proof or evidence that [Father] ever paid child support. He was ordered to pay $75.00 a month beginning in October of 2007. There is no evidence that he has made any payments in child support for these [C]hildren.

For purposes of establishing either form of abandonment – failure to visit or failure to provide support – the relevant four-month period in this case is September 27, 2008 through January 27, 2009. The proof at trial showed that Father visited only once during this four-month period – on December 31, 2008. Father's last visit before then was over a year earlier. The case manager characterized this single visit as "token" in nature; we agree.

-11-

Father suggests that this ground was not established because there was a "no-contact" order in place for part of the relevant period. However, the proof indicated that the court advised Father at an October 2008 hearing that if he passed a drug test, visitation would be permitted. The DCS case manager testified that Father did not submit to the drug test until December 2008 and thereafter had the one visit with the children later that same month. Father also emphasizes that since the filing of the petition, he began exercising his right to visit the children more regularly. While commendable, this does not change the fact of his earlier abandonment of the children. "Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental . . . rights . . . ." *See* Tenn. Code Ann. Sec. 36-1-102(1)(F).

As to child support, Father was ordered to begin paying $75 a month beginning on October 25, 2007.[2]   At trial, Ms. Shirley testified that Father had maintained stable employment working for a temporary employment service "with some gaps in between" for the past year to year and a half. Nonetheless, he made no child support payments during the critical four-month period and none at all until May 2009, some five months after he was at risk of having his rights terminated on this ground alone.

C.

As we have noted, Father participated in the creation of the permanency plan and agreed that its objectives and requirements toward the goal of reunifying him with the children were reasonable. Regarding Father's progress, the trial court found as follows:

> He did complete a drug rehab which was positive, however, [Father] relapsed and has continued to have drug issues.
>
> As far as the mental health assessment, there has been evidence introduced that he had an intake, but there has been no evidence introduced . . . that he followed through with mental health counseling and has continued to go to mental health counseling.
>
> Further, [Father] has failed to show that he has proper and adequate housing and . . . , once the [C]hildren were in custody, he continued to commit criminal offenses, and . . . and the majority of those offenses involved drugs which further proves

---

[2]At trial, Ms. Shirley testified that Father was to begin paying child support on October 25, 2006. We are unable to ascertain the correct date because the order establishing support is not before us; however, the discrepancy is not relevant to our analysis.

that [Father] failed to address his drug issues. So the Court finds by clear and convincing evidence [that Father] has substantially failed to comply with the Permanency Plan.

The proof showed that of his stated responsibilities under the plan developed in 2006, Father had obtained employment in part of 2008-09 and completed the required mental health and alcohol & drug assessments. In addition, the case worker indicated that Father "actually completed an inpatient [alcohol & drug] program," but relapsed – after exiting treatment, Father did not remain sober as reflected by the new drug-related criminal charges he incurred. There was no evidence that Father had obtained stable housing adequate for the children. DCS records reflected that at the time of the hearing, Father had a two-bedroom apartment that he was sharing with a girlfriend and her child. According to Ms. Shirley of DCS, there was no room for the children at the residence. The evidence showed that while the children remained in DCS custody, Father continued to incur new criminal charges – driving under the influence and leaving the scene of an accident with property damages in one incident in March 2007; possession of drug paraphernalia in May 2007; theft under $500 and public intoxication in September 2007; and possession of drug paraphernalia in September 2007 – for all of which he was convicted pursuant to his pleas of guilty.

Lastly, regarding the permanency plan, Ms. Shirley testified that Father had never filed any objections to any of the court orders regarding custody of the children, had never contacted her to discuss or question what he needed to do to have the children returned to him, and had never noted any objection to the affidavits entered by DCS reciting their reasonable efforts to reunite the family.

D.

The trial court found that the final ground, commonly referred to as "persistent conditions," was also established:

> As to ground number four, persistent conditions, the Court finds that the conditions which caused the [C]hildren to come into custody, which was [Father's] drug use . . . , [and] lack of stable housing. Those conditions continue to exist. [Father], based upon the Testimony of Ms. Shirley, is living with a girlfriend and a child, and there is no proof that that's adequate housing, but he would have to come forward to show that he has an adequate house or could provide an adequate house, and he has failed to do that. Furthermore, there continue to be some drug

-13-

charges. So the Court finds by clear and convincing evidence that these conditions continue to exist.

Father's drug abuse was a challenge and presumably the most significant obstacle he faced in regaining custody of the children. Among other problems, his drug use led to the children's removal and, despite completing inpatient drug treatment, Father had been repeatedly arrested for drug-related offenses while the children were living in foster care. At trial, Ms. Shirley testified that she felt Father's conduct displayed a "total wanton disregard for the welfare of the children." We agree. Other problematic conditions also remained – there was no proof of housing suitable for the children and, obviously, Father had broken laws and violated the conditions of his earlier probation by his additional arrests.

In short, the evidence showed that Father had made some progress, but fell far short of remedying the underlying causes for the children's removal from his custody. Moreover, the limited proof gave no indication that the persistent conditions would be remedied at an early date. In summary, the evidence does not preponderate against the trial court's finding that each of the grounds alleged in support of terminating Father's parental rights was clearly and convincingly established.

VII.

Having concluded that the evidence does not preponderate against the trial court's "clear and convincing" finding of grounds for termination, we next consider whether the decision is also in the best interest of the children. We are guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(c).[3]

---

[3]The factors are as follows:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established

(continued...)

The trial court set forth its best interest analysis as follows:

> The Court finds that these children have been in custody now for approximately over three years, that they have been, are currently in a stable home, and they should remain there, and it's in their best interest that [Father's] rights be terminated. The mother has previously surrendered her rights, and the State of Tennessee has partial guardianship, and the Court finds that it would be in the best interest that [Father's] right be terminated and they be allowed to be adopted. So therefore, the Court is finding that the State has met its burden on the Petition to Terminate.

As the trial court's findings suggest, at the time of the trial, the children had remained in the same pre-adoptive foster home they were placed in for more than three years. To his credit, Father had begun to visit the children since the termination petition was filed and had

---

[3](...continued)
between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

recently began paying child support, albeit months after the petition was filed and years after the court ordered him to do so. However, there was nothing to show that Father had made "such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in [his] home. . . ." Father's continued issues with drug and alcohol abuse had led to new criminal charges since the children were taken from his custody. As to housing, there was no indication that the apartment in which he lived with a girlfriend and her child had adequate space and was otherwise suitable for the children. Meanwhile, the children were in a stable home and all of their needs were being met by their foster parents. The older child was partially deaf and mildly mentally challenged and was receiving special education services as well as in-home services. According to their case manager, he had "drastically improved just over the last couple of months" before the hearing. The younger child had no developmental issues and both were otherwise healthy and doing well. The foster parents were willing to adopt both children. Our review of the record leads to the conclusion that termination of Father's parental rights is in the best interest of the children.

VIII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Eric B. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE

-16-